## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE ALIERA COMPANIES INC., | ) | Case No. 21-11548 (JTD) |
| | ) | |
| Debtor.[1] | ) | **Obj. Deadline: January 6, 2022, at 4:00 P.M. (EST)** |
| | ) | **H'rg Date: January 13, 2022, at 11:00 A.M. (EST)** |

## PETITIONING CREDITORS' MOTION TO TRANSFER VENUE OF THE LATER-FILED VOLUNTARY BANKRUPTCY CASES OF THE ALIERA COMPANIES INC. AND ITS FOUR AFFILIATES

## I.    INTRODUCTION

Petitioning creditors Gerald and Roslyn Jackson, Dean Mellom, and Austin Willard, individually and, with Hanna Albina, on behalf of the classes they represent (collectively the "**Petitioners**"), move the Court for an order under 11 U.S.C. § 1014(b) and Bankruptcy Rule 1014(b) transferring venue of the related Chapter 11 bankruptcy cases commenced on December 22, 2021 in the U.S. Bankruptcy Court for the Northern District of Georgia on behalf of The Aliera Companies, Inc., which is the debtor in this case commenced three weeks earlier on December 3, 2021 (the "**Debtor**"), and its four affiliates, Advevo, LLC, Ensurian Agency, LLC, Tactic Edge Solutions, LLC, and USA Benefits & Administrators, LLC (collectively, with the Debtor, "**Aliera**") to this Court, which has been presiding over the bankruptcy case and liquidation of Aliera's affiliated corporation, Sharity Ministries, Inc., formerly known Trinity Healthshare, Inc. ("**Sharity**").[2] The Petitioners also move this Court for an interim order under Bankruptcy Rule

---

[1]    The last four digits of the Debtor's federal taxpayer identification number are 9555. The address of the Debtor's principal office is 990 Hammond Drive, Suite 700, Atlanta, Georgia 30328.

[2]    Sharity's bankruptcy case is Case No. 21-11001 (JTD).

1014(b), on either ordinary or shortened notice, directing or requiring the parties to the later-filed voluntary bankruptcy cases of the Debtor and its four affiliates not to proceed further with those cases while this motion remains pending, except to the extent that proceeding further is necessary to preserve the property of Aliera's bankruptcy estates. In support of this motion, the Petitioners state that:

## II.    PRELIMINARY STATEMENT

1.      Aliera was created by Shelley Steele, Chase Moses and Tim Moses as a vehicle to sell sham health insurance to consumers across the country. *See* Declaration of Eleanor Hamburger, *Ex. A,* ¶ 94.[3] Regulators in California, Colorado, Connecticut, Iowa, Maryland, New York, New Hampshire, New Jersey, New Mexico, Oregon, Texas, and Washington have taken regulatory action against Aliera and Sharity. *See* http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation for a compilation of Orders by state insurance regulators.[4] These regulators have concluded that Aliera sold unauthorized and illegal health insurance under the relevant state insurance laws. The state regulators have generally determined that Aliera created Trinity/Sharity, a sham health care sharing ministry, and contracted with it to evade insurance regulation and sell illegal, sham health insurance. *See e.g., id.,* New York Statement of Charges, p. 2.

2.      Petitioners obtained judgments in two class action lawsuits against Aliera and Trinity alleging that they and thousands of other health care consumers were sold fraudulent and unauthorized health plans under the laws of each state. *See Jackson et al., v. The Aliera*

---

[3]      All documents referred to as *"Ex. __ "* are Exhibits to the Declaration of Eleanor Hamburger unless otherwise identified.

[4]      The Court may take judicial notice of each regulatory action listed. *See In re Grasso*, No. 14-1741, 2014 U.S. Dist. LEXIS 94274, at *9 (E.D. Pa. July 10, 2014).

*Companies, Inc.; Aliera Healthcare Inc.; Trinity Healthshare Inc.,* No. 2:19-cv-1281 (J.

Rothstein, W.D. Wash.) and *Albina et al. v. The Aliera Companies, Inc.; Trinity Healthshare*

*Inc.; OneShare Health LLC,* No. 5:20-cv-496-JMH (J. Hood, C.D. Ky.) (collectively, the

"**Lawsuits**"). In both cases, the district courts concluded that Aliera had engaged in a fraud when

it sold sham health insurance to its members. *Exhs. B-C* (*Jackson* decision); *Ex. D* (*Albina*

decision). In *Jackson,* the district court found that Aliera had engaged in fraud when it sold

unauthorized health insurance:

> The Court finds that defendants have, indeed, violated RCW 48.01.040, .030, and
> the regulations that have been issued under that by illegally selling health insurance,
> and by failing to make payments as promised, to the individuals; and, in fact,
> siphoning off money from … the individuals, so that there are no funds now … to
> repay the class members for the money that has been taken from them. Aliera has
> misused that money and has defrauded these individuals.

*Ex. C.* In *Albina,* the district court held that "Aliera misled the class members into entering into

contracts for a product that was not what it purported to be and did not comply with applicable

federal or state law." *Ex. D.* The judgments in *Jackson* and *Albina* total more than $25 million. *See*

Aliera Involuntary D.I. 1-1, 1-2. Two other courts similarly concluded that Aliera designed,

marketed and sold illegal health insurance. *See Moeller v. Aliera Cos.*, No. CV 20-22-H-SEH,

2021 U.S. Dist. LEXIS 122532, at *8-9 (D. Mont. June 30, 2021); *LeCann v. Aliera Cos.*, No.

1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827, at *56-57 (N.D. Ga. June 22, 2021).

     3.     Shortly after obtaining the judgments, Petitioners commenced involuntary

bankruptcy proceedings against Aliera because Aliera's insiders had rendered the company

insolvent, in part by causing Aliera to "loan" the insiders millions of dollars. *See* Aliera

Involuntary D.I. 1. Rather than filing bankruptcy, which would be judicially supervised and

require clawbacks of any fraudulent transfers, Aliera's insiders chose to commence an

"Assignment for the Benefit of Creditors" ("**ABC**") in Fulton County, Georgia. *Ex. E.* Under

Georgia law, an ABC is not overseen by a court and the insiders get to choose the Assignee. *See* *Ex. F* (the Assignee's advisory firm, GGG Partners LLC, advertises these features on its website to promote its services). Under Geogia law, an assignee is not required to pursue fraudulent transfers or any other avoidance or clawback actions against insiders, although they may choose to do so. *See* O.C.G.A. §18-2-54. The Aliera insiders hand-picked an assignee, Katie Goodman, to wind up the business and left virtually no assets in Aliera or its subsidiaries, apart from its claims against third parties. *See Ex. E.* Petitioners were concerned that the assignee, selected by the insiders, would have no incentive to aggressively pursue Aliera's claims against the insiders and might even settle claims that Aliera has against them for a small fraction of their true value.

4.      Despite having opted to file the ABC instead of bankruptcy cases, and despite the pending involuntary bankruptcy before this Court, on December 22, 2021, Aliera filed a competing Chapter 11 bankruptcy petition in the Northern District of Georgia. *Ex. G.* The petition was signed by the assignee, who may have a conflict of interest in doing so, given her role in the ABC. It was also authorized by Shelley Steele, one of the Aliera insiders at the heart of the illegal scheme. *See Ex. G,* pp. 7-10 (Ms. Steele is the sole director of each of the Aliera entities -- there are no independent directors of Aliera or its subsidiaries).

5.      Petitioners' counsel convened a "meet and confer" by Zoom with Aliera's counsel on December 27, 2021 to discuss the venue dispute. Hamburger Decl., ¶ 6. The parties' counsel discussed a consensual resolution of the dispute but were unable to reach agreement on the appropriate venue of this case. *Id.* The parties did agree that, for judicial and party efficiency, the same court should handle the bankruptcies of Aliera and its subsidiaries. *Id.* However, Aliera's counsel did not agree that the same court should handle the bankruptcy of Sharity and its affiliate

Aliera. *Id.* The following day, Petitioners' counsel alerted Aliera's counsel to its plan to file this motion. *Id.*

6.      Petitioners move to change the venue of the Chapter 11 bankruptcies filed in the Northern District of Georgia for Aliera and its subsidiaries to the District of Delaware so that one bankruptcy court will determine the rights and responsibilities of Aliera, its subsidiaries, insiders and other third parties, as well as those of the AlieraCare members who were defrauded by Aliera, Sharity and the insiders who ran both companies. This Court is better suited to determine the rights of Aliera's creditors in this process, including the rights of Petitioners, and the largest creditor of Aliera, the Sharity Liquidating Trust.

7.      Petitioners also move pursuant to Bankruptcy Rule 1014(b) that the Court "order the parties to the later-filed cases not to proceed further" until it makes the venue determination, except to the extent such actions are essential to preserve property of Aliera's bankruptcy estates. The Petitioners reserve the right to move to shorten notice with respect to their request for a stay of proceedings in the later-filed cases under Rule 1014(b); however, before the Petitioners may so move, their counsel must, as required by Local Rule 9006-1(e), consult with Aliera's counsel and the U.S. Trustee to determine whether either party would oppose such a request for shortened notice.

### III.   JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

8.      The Court has jurisdiction of this case and this proceeding under 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference*, which the U.S. District Court for the District of Delaware entered on February 29, 2012.

9.      Venue of this case and this proceeding in this District is proper under 28 U.S.C. §§ 1408 and 1409.

10.     The Court has constitutional authority to enter a final order or judgment in this core proceeding arising in a case under the Bankruptcy Code; however, the Petitioners also consent to the Court's entry of a final order or judgment in this proceeding if it is determined that the Court, absent the parties' consent, cannot enter a final order or judgment in this proceeding R

## IV.  BACKGROUND

**A.     Statutory Background Leading to the AlieraCare Fraud**

11.     When Congress passed the Patient Protection and Affordable Care Act ("**ACA**") in 2010, it required all individuals either to be covered by health insurance or pay a penalty, commonly referred to as the "individual mandate." Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("**HCSMs**"). Congress, however, established specific and rigorous requirements to ensure that only legitimate *existing* entities with a history of no fewer than ten years administering these shared plans to those of a common religious faith would qualify as an HCSM. Those requirements limit the exception to an entity that meets all five of the following statutory prongs:

(a)     It is a tax-exempt § 501(c)(3) organization;

(b)     its members "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs;"

(c)     its members "retain membership even after they develop a medical condition;"

(d)     it (or its predecessor) must have "been in existence at all times since December 31, 1999," and medical expenses of its members must have "been shared continuously and without interruption since at least December 31, 1999;" and

(e)     it conducts an annual audit by an independent CPA made available to the public upon request.

26 U.S.C. § 5000A(d)(2)(B)(ii)(I)-(V). The 1999 cutoff date in the fourth prong serves two important legislative purposes: (1) it ensures reliability of care that comes with historical practice, and (2) it prevents "opening the flood gate" to groups seeking to circumvent the requirements of the ACA. *Liberty Univ. v. Lew,* 733 F.3d 72, 102 (4th Cir. 2013).

12.     If an entity qualifies as an HCSM under 26 U.S.C. § 5000A, then it must also determine whether it must obtain a certificate of authority issued by the relevant state's insurance commissioner, or, as in about half of the States, if it qualifies under state law as an exempt HCSM. *See e.g.,* Revised Code of Washington ("**RCW**") § 48.43.009 (Washington permits genuine HCSMs to sell products in the state). Under each state's law, if an entity meets the definition of "insurance" and is not otherwise exempt, it must be authorized by the state regulator before it may sell its health plans. *See e.g.,* RCW § 48.05.030.

13.     The founders of Aliera, however, exploited the HCSM exemption in the ACA and claimed to be exempt from insurance regulation by creating a phony HCSM, duping vulnerable people into purchasing what looked like insurance, and then refusing to pay their medical expenses. According to the Washington Office of the Insurance Commissioner, rather than pay out the required $0.80 of every $1.00 collected from monthly payments on health benefits, (*see* 42 U.S.C. § 300gg-18(b)(1)(A)(i)), the health plans designed, marketed and sold by Aliera spent only ***$0.16 out of every $1.00 on health benefits***. *Ex. H,* p. 18 of 35. The rest went to for-profit, privately owned Aliera and its affiliates for various fees and reimbursements. *Id.* As the *Albina* and *Jackson* district courts concluded, Aliera and its insiders designed and administered a fraudulent scheme to make extraordinary profits for Aliera's owners, while providing almost no health benefits for AlieraCare enrollees.

**B.      Aliera's Creation by a Convicted Felon**

14.      Timothy Moses, Aliera's founder, was convicted of felony securities

fraud and perjury in federal court in Georgia. *See United States v. Moses,* 219 Fed. App'x 847

(11th Cir. 2017) (affirming his conviction). He was sentenced to over six years in prison. ***Ex. A,***

at 8-9, ¶ 49. After he was released, he was subject to supervision for five years. ***Ex. I.*** Shortly

after his release, Mr. Moses misled his supervising probation officer about his financial affairs

and failed to disclose bank account information and new lines of credit. *Id.* Mr. Moses'

supervised release was terminated in April 2015, about six months before Aliera's creation. *Id.*

15.      Shelley Steele, Mr. Moses' wife, incorporated The Aliera Companies in Delaware

in 2015. ***Ex. J.*** Aliera's original scope of business was "to engage in the business of providing all

models of Health Care to the general public," and "[t]o buy, own or acquire other businesses, to

market and in any way improve the commercial application to the betterment and pecuniary gain

of the corporation and its stockholders…." *Id.* It later amended its Articles to include a broader

scope of business: "The purpose for which the Corporation is formed is to engage in any lawful

act or activity for which corporations may be organized…." ***Ex. K.*** Aliera has never been and

does not claim to be an HCSM.

16.      After Aliera's formation, Timothy Moses convinced Anabaptist Healthshare, a

small nonprofit with a letter of recognition as an HCSM from the federal government, to allow

Aliera to market HCSM plans through a subsidiary that Anabaptist would create solely for that

purpose, Unity Healthshare, Inc. ***Ex. A,*** at 4-5, ¶¶ 18-24. Mr. Moses admitted in sworn testimony

that he was key to the relationship between Anabaptist and Aliera. *Id., **Ex. L,*** ¶¶ 20-27, and its

attached Exhibits A and B (signing as "Executive Director" of Aliera).

17.     The relationship between Aliera and Anabaptist soured by May 2018 when Anabaptist discovered that Mr. Moses had misappropriated Unity Healthshare's funds. *Ex. A*, at 13, ¶ 71. Anabaptist terminated its agreement with Aliera on August 10, 2018, and the parties sued each other in state court in Georgia, *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 ("Georgia Litigation"). *See generally, Aliera Healthcare, Inc. v. Anabaptist Healthshare,* 844 S.E. 2d 268 (Ga. App. 2020).

**C.     Sharity Was Created in 2018 as a Sham HCSM By Aliera**

18.     With Aliera's relationship with Anabaptist ending, Aliera created Trinity Healthshare, Inc. (later renamed as "Sharity Ministries, Inc." likely due to adverse publicity) as a Delaware nonprofit entity on June 27, 2018. *Id., Ex. M,* at 5. Aliera installed William Thead, a former employee and close personal friend of the Moses family, as Trinity's CEO. *Id., Ex. N,* ¶¶ 62, 63. Trinity initially had only one other board member – Mr. Thead's brother. *Id., Ex. O,* at 7 and 33 of 43. Trinity had no members when it was formed. *Id., Ex. N,* at 19, ¶ 65. On or about July 3, 2018, *Aliera's* attorney (Burr Forman LLP) filed an application with the IRS on behalf of Trinity seeking recognition as a 501(c)(3) tax exempt entity. *Id., Ex. P.* Trinity represented to the IRS that it was applying for 501(c)(3) status as "a newly formed entity," and answered "no" to the question, "are you a successor to another organization?" *Id*., at 18 of 52.

19.     In August 2018, Aliera and Trinity entered into a Management and Administration Agreement. *Ex. Q*. Under that Agreement, Trinity delegated to Aliera the exclusive right to design, market, enroll, administer (either directly or through a third-party administrator), and prepare financial and tax statements for the joint Aliera/Trinity healthcare plans. *Id*., at 4-5. Under that Agreement, Aliera was to have exclusive control over the member list, and all member payments were to be made directly to a bank account in Aliera's name. *Id.,*

at 4, ¶ 2.e., and at 5, ¶ 3.c. Aliera would retain ___65%___ of the total member share contributions for

the type of plans the Claimants here purchased. Of the 35% that would be allotted to Trinity,

only 44.3% (just ___15.5%___ of the amount members paid) would be placed into a reserve account for

payment of members' claims. *Ex. Q, Ex. B.*[5]

20.    The health plans designed, marketed and administered by Aliera, (branded

"AlieraCare") were intentionally misrepresented to enrollees as equivalent to traditional health

insurance:

> (a)    AlieraCare offered health plans at the Bronze, Silver, and Gold levels (just
> like ACA plans)**,** and described the plans as "great for those who simply
> want to have peace of mind knowing that they will be able to receive the
> healthcare services they need, when they need them." *Ex. R,* at 24 of 31.
> AlieraCare claimed to cover telemedicine, unlimited wellness and
> preventive services, primary care, urgent care, specialty care, prescription
> discounts, maternity care, emergency room, hospitalization and surgical
> services. *Id.* The AlieraCare plans were described as providing members
> "with options that look and feel like more traditional healthcare plans but
> at a fraction of the price." *Ex. R,* at 15 of 31.

> (b)    AlieraCare also offered health plans at the Value, Plus, and Premium
> levels, describing the plans as comparable to catastrophic health insurance
> that "allow members to achieve comparable cost assurances for
> catastrophic healthcare services (including preventative care and
> immediate access to doctors through office visits, urgent care, and
> telemedicine) at a much lower cost ..." *Ex. R,* at 22 of 31.

21.    AlieraCare Members were instructed to present their membership cards to their

health care providers when they receive medical services. *Ex. T,* at 8 ("Keep your Member Card

with you at all times; ...."), and at 11 ("Upon arrival at a clinic, present your Membership Card

and one photo ID"). The providers were directed to send their bills directly to Aliera, which then

would determine whether and how much will be paid. *Ex. R,* at 16 of 31. ("How does my doctor

---

[5]    Trinity reported to the IRS that in 2019 it paid Aliera $32,138,105 for "a variety of
management services." *Ex. S,* at 31 of 41.

or hospital get paid? Once your medical provider has properly processed your medical claim to be shared by the membership, the medical need is adjudicated and payment is issued directly to the provider.").

**D.      Aliera Enrolled Tens of Thousands of Members Throughout the United States in Unauthorized, Illegal Health Insurance Plans**

22.      The Moses family's plan to create and use Aliera and Sharity to sell health coverage that offered the "look and feel" of health insurance while providing few actual benefits, worked. Thousands of people signed up for these plans thinking they were buying something that would provide coverage for their health needs. In reality, few claims were paid.

23.      Each Petitioner was sold an AlieraCare health plan or transferred into an AlieraCare plan. All were harmed by the sale of unauthorized and illegal health insurance, either by making monthly payments for sham coverage, or worse, by incurring uncovered medical expenses that would have been covered, had AlieraCare plans complied with the minimum requirements of state insurance law. *See Exhs. B-D.*

24.      The vast majority of AlieraCare members (95.4%) do not reside in Georgia. Luria Decl. ¶ 9. The largest concentration of members, more than 22,000, is in California, New York and Texas. *Id.*

**E.      The Lawsuits**

25.      The judgments in the *Jackson* and *Albina* cases are very similar. In each, the federal district courts concluded that Aliera designed, marketed, sold and administered unauthorized and illegal "insurance" under each state's insurance law. *See Exhs. B-F.* Neither Sharity nor Aliera obtained a certificate of authority to engage in the business of insurance in any state in which it sold these health plans. No state regulator ever reviewed, recognized or authorized an AlieraCare plan. The Aliera plans did not comply with a myriad of federal or state

insurance laws and consumer protections. Instead, as noted above, the companies spent only about $0.16 out of every dollar on health benefits. *Ex. H,* p. 18. The rest of the monthly payments from members was spent on exorbitant fees to Aliera and others. *Id.*

**F.      Sharity Files for Bankruptcy on July 8, 2021**

26.      On July 8, 2021, Sharity Ministries, Inc., a nonprofit corporation closely affiliated with The Aliera Companies, Inc., filed for bankruptcy in the District of Delaware before this Court. *In re Sharity*, D.I. 1 (referred to as "Sharity D.I."). The U.S. Trustee (Sharity D.I. 71), joined by the state attorneys general of Texas, New York, California, New Hampshire, Washington, Wisconsin (Sharity D.I. 93), Massachusetts (Sharity D.I. 89) and the petitioners in this matter (Sharity D.I. 85), moved to remove the Sharity insiders from controlling the bankruptcy. The Court held the motion in abeyance but required the expansion of duties of the Subchapter V Trustee, including an investigation of the financial affairs of Sharity Ministries. Sharity D.I. 144. The Court also appointed an official committee of Sharity Members. *Id.* At the same time, the Court permitted the retention of Neil Luria as Chief Restructuring Officer ("CRO") but limited any control over his retention by the Sharity insiders. *See* Sharity D.I. 140. Specifically, the CRO could only be removed with the Court's authorization, and any significant changes in the CRO's activities must be Court approved. *Id.* The Sharity Independent Board members delegated all authority to Mr. Luria, ensuring his independence. *See* Luria Decl., ¶ 5.

27.      Aliera and its subsidiaries appeared in the Sharity Bankruptcy. *See* Sharity D.I. 30. Aliera's counsel moved to withdraw from the representation on October 8, 2021. Sharity D.I. 243. Aliera's counsel certified that Aliera consented to the withdrawal. *Id.* It also certified that

continued representation would "result in an unreasonable financial burden" on counsel.[6] *Id.* On October 28, 2021, the Court permitted Aliera's counsel to withdraw. Sharity D.I. 281.

28.     On November 22, 2021, the Court authorized the Sharity Committee of Members to file one or more adversary proceedings, on behalf of Sharity, provided the litigation was approved by the Sharity CRO, Mr. Luria. Sharity D.I. 305. Shortly thereafter, on November 29, 2021, the Sharity Members Committee filed an adversary proceeding against Aliera and its four subsidiaries, seeking approximately $574 million in damages on behalf of Sharity members. Sharity D.I. 313. The adversary action was served on Aliera and its subsidiaries on December 7, 2021. Adv. Proc. D.I. 10-2. No appearance has been entered and no responsive pleadings have been filed in the adversary proceeding.

29.     On December 2, 2021, the Court approved a plan of liquidation for Sharity. Sharity D.I. 343. The Sharity Liquidating Trust will be effective on December 31, 2021. Luria Decl. ¶ 6. Its Board of Directors will be the former Sharity Committee of Members and its Trustee will be Neil F. Luria, the current CRO of Sharity, all of whom are already deeply familiar with the facts, finances, claims and defenses surrounding these cases. *Id.*

30.     Petitioners' counsel also represents the Sharity Members Committee and expects to represent the Sharity Liquidating Trust. Counsel's retention agreement,[7] and their role representing the Petitioners and the interests of other Sharity Members has been fully disclosed to the Court, the U.S. Trustee, Sharity Members and Petitioners. *See* Sharity D.I. No. 212-1, 244,

---

[6]     The ABC filing on October 4, 2021 revealed that Aliera owed its litigation counsel, Burr Forman LLC over $1.5 million in legal fees to defend the corporation. *Ex. E,* p. 8 of 26.

[7]     Petitioners' counsel represents Petitioners and the Sharity Liquidating Trust on a capped contingent basis, in order to maximize the returns to Sharity members. *See* Sharity D.I. No. 212-1.

247, 253, 359-360. The interests of the Sharity Liquidating Trust and the Petitioners are fully

aligned and Petitioners' counsel is not aware of any actual or potential conflict of interest.

Hamburger Decl., ¶ 7.

**G.      Aliera Files a Deed of Assignment of the Benefit of Creditors**

31.      Rather than filing the instant Chapter 11 proceedings, on October 4, 2021, Aliera

recorded a Deed of Assignment for the Benefit of Creditors in Fulton County, Georgia, on its

own behalf and that of its affiliates. *Ex. E.* The assignment reflects virtually no assets and

substantial debts. *Id.* It also shows a "loan" of more than $6.6 million by Aliera to its

"shareholders," presumably Shelley Steele and perhaps others. *See id.,* p. 15. This "loan" may

have been a vehicle to transfer out of the estate substantially all of the then-available cash, the

"repayment" of which is the likely means by which the competing chapter 11 cases are financed.

Based on information and belief, Petitioners allege that Aliera's insiders hold significant

unaccounted-for amounts that members paid for coverage of their healthcare costs. Through its

repeated attempts to enforce a meritless arbitration clause, Aliera delayed resolution of various

lawsuits for years, giving its insiders time to secrete misappropriated assets. Hamburger Decl., ¶

3. Petitioners were concerned that the ABC, occurring without judicial oversight, and without a

requirement to clawback various actual or constructively fraudulent transfers, was intended to

thwart any chance of significant recovery by Aliera enrollees.

32.      Petitioners moved the *Jackson* and *Albina* courts (before whom these matters

have been pending for many months) to obtain class certification and default judgments, or, if

Aliera appeared with counsel, summary judgment. Hamburger Decl. ¶ 8. Despite service on

Aliera, no counsel for Aliera appeared at either proceeding. After entry of the judgments, the

Petitioners filed their current petition for an involuntary bankruptcy case against Aliera. As noted

above, the two default judgments specifically identified at least three creditors – Dean Mellom, Gerald and Roslyn Jackson, and Austin Willard – as well as two classes comprised of tens of thousands of Sharity members. *Exhs. B-D.* Once these judgments were obtained, Petitioners filed petitions for the involuntary bankruptcy of Aliera, on December 3, 2021. Aliera Involuntary D.I. 1. Rather than appearing and contesting the involuntary proceeding in this Court, Aliera and its affiliates filed separate petitions in the Bankruptcy Court for the Northern District of Georgia. At no time before filing the second bankruptcy did the Assignee or Aliera's counsel reach out to Petitioners or their counsel about the pending involuntary bankruptcy. Hamburger Decl. ¶ 8.

33.     On December 27, 2021, Aliera's counsel met with Petitioners' counsel about the proper venue for the Aliera bankruptcy. *Id.,* ¶ 6. The parties were unable to reach an agreement on venue. Petitioners remain concerned that Aliera's assignee, now designated the "Chief Liquidation Officer" is not truly independent from the Aliera insiders, and that Aliera is challenging venue in this Court to protect the Aliera insiders.

## V.    RELIEF REQUESTED

34.     By this Motion, the Petitioners ask this Court to enter an order, substantially in the form of the proposed order that was filed together with this Motion (the "**Proposed Transfer Order**"), transferring venue of the later-filed voluntary bankruptcy cases of the Debtor and its four affiliates from the U.S. Bankruptcy Court for the Northern District of Georgia to this Court, the U.S. Bankruptcy Court for the District of Delaware.

35.     Further, by this Motion, the Petitioners ask this Court to enter an interim order, substantially in the form of the proposed interim order filed together with this Motion (the "**Proposed Interim Order**"), on either ordinary or shortened notice, directing or requiring the parties to the later-filed voluntary bankruptcy cases of the Debtor and its four affiliates not to

proceed further with those cases while this motion remains pending, except to the extent that proceeding further is necessary to preserve the property of Aliera's bankruptcy estates.

## VI.   BASIS FOR RELIEF

**A.     Motion for Transfer of Venue of Later Filed Aliera Cases to Delaware – Legal Standard**

36.     Since Aliera was incorporated in Delaware, venue was and remains proper before this Court. 28 U.S.C. §1408(1). Sharity filed here, so its Independent Directors must have considered this Court to be appropriate and proper venue.

37.     A court may transfer venue in "the interest of justice **_or_** for the convenience of the parties." 28 U.S.C. 1412; Fed. R. Bankr. P. 1014 (b) (emphasis added). Each provision is an independent ground for transferring venue. *In re Landing*, No. 20-02176-NPO, 2020 Bankr. LEXIS 3655, at *7 (Bankr. S.D. Miss. Dec. 2, 2020). The burden of proof is on the movant to show by a preponderance of the evidence that transfer of venue is warranted. *In re Mun. Corr., LLC*, No. 12-12253-mkn, 2012 Bankr. LEXIS 5938, at *13 (Bankr. D. Nev. Dec. 28, 2012).

38.     When considering whether a change of venue is in the "interest of justice," courts consider whether the transfer would "promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *In re Enron Corp.*, 274 B.R. 327, 343 (Bankr. S.D.N.Y. 2002).

39.     A change of venue for convenience is typically based on six factors: "(1) the proximity of creditors of every kind to the Court; (2) the proximity of the debtor to the Court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if liquidation should result." *In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 Bankr. LEXIS 684, at *7 (Bankr. D. Del. Mar. 4, 2016). The factor given the greatest

weight is the "economic administration of the estate." *Id., citing to In re Enron Corp.,* 274 B.R. 327, 343 (Bankr. S.D.N.Y. 2002).

40.     In the post-pandemic legal world, courts have concluded that physical proximity of the debtor or witnesses to the actual courthouse is no longer a significant factor, as most hearings are held telephonically or on zoom, eliminating the need to travel to or physically appear in any particular jurisdiction in order to appear in court. *See e.g., In re Certa Dose, Inc.*, No. 21-11045 (LGB), 2021 Bankr. LEXIS 3053, at *51-52 (Bankr. S.D.N.Y. Nov. 4, 2021). And while courts typically place significant weight on the choice of venue by the debtor when the debtor files the original bankruptcy petition, this is not a typical case. *See, In re Mun. Corr., LLC*, 2012 Bankr. LEXIS 5938, at *13 (Bankr. D. Nev. Dec. 28, 2012). Here, the original bankruptcy filing was involuntary, such that the choice of venue by the debtor must be "closely scrutinized" and is not necessarily accorded the same deference. *See id.; In re Caesars Entm't Operating Co.*, No. 15-10047 (KG), 2015 Bankr. LEXIS 314, at *24-25 (Bankr. D. Del. Feb. 2, 2015).

41.     Finally, there is no "litmus test" for transfer of venue. *In re Landing*, 2020 Bankr. LEXIS 3655, at *2. Rather courts must make a "case-by-case determination based upon all relevant factors." *Id.* The unique facts of these extraordinary and complex cases support continued venue in the District of Delaware.

42.     Bankruptcy Rule 1014(b) empowers the Court *sua sponte* or upon request to "order the parties to the later-filed cases not to proceed further" until it makes the venue determination. These cases are uniquely suited for the Court to enter such an order, and the Petitioners respectfully request that it do so, except to the extent that Aliera may be able to show that there are actions which must be taken in the interim to preserve Aliera or its assets.

**B.      In this Uniquely Complex Case, Venue for Aliera's Bankruptcy Should Remain in Delaware in the Interest of Justice.**

43.      To determine which venue is preferred in the interest of justice, courts consider whether transferring venue would impose a significant "learning curve" on the receiving court. *In re Enron Corp.*, 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002). This analysis reviews the time and effort undertaken by the current court and the effect of starting over with the receiving court. *In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 Bankr. LEXIS 684, at *15 (Bankr. D. Del. Mar. 4, 2016).

44.      These are complex cases. They involve a relatively new area of law (the ACA's HCSM provisions), and the interplay of the federal requirements with state insurance regulations. These cases are particularly challenging since insurance companies (which four courts and many state regulators have concluded Aliera is)[8] rarely file for bankruptcy. Instead, when a health insurer becomes insolvent, it is typically governed by state insurance and receivership laws. *See* https://www.nolhga.com/policyholderinfo/main.cfm/location/insolvencyprocess (last visited 12/28/21). Since the insiders at Aliera designed its business operations and that of Sharity **to evade state health insurance regulation**, it is unlikely that any bankruptcy court -- other than this one -- has knowledge about the issues involved in the Aliera/Sharity scheme. This Court has

---

[8]      *See e.g., Ex. C,* (In *Jackson*: "defendants have [been]… illegally selling health insurance"); *Ex. D,* ("[T]he products Aliera sold to the class members met the definition of insurance under Kentucky law."); *Moeller v. Aliera Cos.*, No. CV 20-22-H-SEH, 2021 U.S. Dist. LEXIS 122532, at *8-9 (D. Mont. June 30, 2021) ("The 2019 Trinity Member Guide was, notwithstanding disclaimer by Defendants Aliera and Trinity, an insurance contract (plan) under Montana law."); *LeCann v. Aliera Cos.*, No. 1:20-cv-2429-AT, 2021 U.S. Dist. LEXIS 115827, at *56-57 (N.D. Ga. June 22, 2021) "Aliera's plans are insurance under Georgia law"); *see also* http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation (compiling state regulatory actions against Aliera and Sharity). No court or other adjudicator has concluded that Aliera was selling legitimate HCSM plans.

spent the past five months familiarizing itself with various aspects of the Sharity/Aliera business. In contrast, the Georgia court has not yet entertained a hearing on this matter. *Id.* Similarly, the Delaware U.S. Trustee and his representative have invested significant effort to protect the interests of Sharity Members and is well positioned to represent the interests of Aliera's other creditors in the involuntary bankruptcy as well. *Id.,* ¶ 9. In contrast, this case is a stranger to the U.S. Trustee in the Norther District of Georgia and it makes little sense to have the government expend the time and expense to have two District U.S. Trustees working essentially the same case. This case in Delaware should pose no prejudice to Aliera which has appeared in the Sharity Bankruptcy, (Sharity D.I. #33) and has retained new Delaware counsel. *See* Hamburger Decl., ¶ 6.

45. Aliera's rights and obligations, and that of its insiders, are enmeshed with that of Sharity, the corporation that Aliera created and controlled to implement the HCSM scheme: Aliera was the enabler and Sharity was the front for the scheme. Aliera conceded as much when it argued that Aliera was "inextricably intertwined" with Sharity when Sharity's bankrupty was filed, such that all civil litigation against Aliera should be stayed. *See Ex. U* (Aliera asserted that this Court would likely decide whether "Aliera misrepresented Trinity's and Unity's sharing programs to mislead members into believing that Trinity and United provide insurance…"); *Ex. V* ("The Bankruptcy Court will almost assuredly make a determination as to whether [Sharity] is a valid HCSM for the purposes of resolving obligations and claims of the [Sharity] Bankruptcy Estate" which necessarily impacts members' claims against Aliera). Allowing this Court to continue to adjudicate whether Aliera and its insiders created, designed and sold their members sham health insurance is consistent with what Aliera argued to other federal courts.

46.     The Sharity Liquidating Trust and the Petitioners are the largest creditors of

Aliera by orders of magnitude.[9] *See Ex. G*, p. 13 of 28*.* They will play the largest role in the

Aliera bankruptcy. *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 Bankr. LEXIS

684, at *16. The Member/Creditor constituency is accustomed to the liberal access and technical

means by which they can attend virtual hearings in Delaware; AlieraCare members have

participated in the Sharity bankruptcy and will continue to participate in the bankruptcy of

Aliera, if it continues in Delaware. Petitioners chose the venue for the involuntary, and they,

along with the Sharity Liquidating Trust, are poised to pursue the Aliera insiders in Delaware. It

would be unfair "to require them to hire new counsel and wait for its new advisors to 'get up to

speed'" in a new jurisdiction. *Id.* For individual Sharity members who retained their own

Delaware counsel, it would also be unfair to require them to now retain a second representative

in Georgia.

47.     Transfer of venue to Georgia would also cause unnecessary delay. *Id.* In addition

to Delaware being the preferred forum by the Petitioners, more than half a dozen state regulators

have already appeared in the Sharity Bankruptcy in Delaware. The State of Texas has already

submitted a Notice of Appearance in this case. *See* Aliera Involuntary D.I. 15. It is expected that

other state regulators will participate in the Aliera bankruptcy. Hamburger Decl., ¶ 9. While state

regulators do not need local counsel to appear in the District of Delaware, they may only appear

in the Northern District of Georgia with local counsel. *See* Northern District of Georgia LR 83.4

(c) (In the Northern District of Georgia, only the federal government may appear without a

---

[9]     Even in bankruptcy, Aliera disputes the claims of ***all AlieraCare members***. *See Ex. G,* p. 13. It disputes the *Jackson* and *Albina* judgments even though it failed to retain counsel to continue to litigate that case, and failed to appeal the default judgments. *Id., see* Hamburger Decl. ¶8. It does not even acknowledge the claims of Aliera members who enrolled through Unity Healthshare, that are also subject to litigation. *See id.*

petition for admission by a member of the Georgia bar; state governments must be represented by local counsel). Requiring these state regulators to also retain counsel and appear in a new court in a different jurisdiction will impose unwarranted costs and delays and is not in the interest of justice.

## C.   Venue of all the bankruptcies in the District of Delaware is Convenient.

48.     All of the convenience factors weigh in favor of the District of Delaware, when considering that all of the Court's hearings currently occur via Zoom. *See* Chambers Procedures for Judge John T. Dorsey, at https://www.deb.uscourts.gov/content/judge-john-t-dorsey (last visited 12/27/21); *In re Certa Dose, Inc.*, No. 21-11045 (LGB), 2021 Bankr. LEXIS 3053, at *51-52. No creditor, AlieraCare enrollee, witness or counsel will be required to travel to Delaware to participate in the proceedings.

49.     Aliera's creditors are not concentrated in Georgia – rather they are spread out across the country (more than 95% of AlieraCare members reside outside of Georgia). Luria Decl., ¶ 9). The handful of Aliera's trade creditors that are located in Georgia[10] and may find the cases to be conveniently litigated there, do not outweigh the significant inconvenience to tens of thousands of AlieraCare enrollees to participate in a second jurisdiction for this bankruptcy.

50.     Similarly, the location of Aliera's assets does not require transfer of the venue to Georgia. According to Aliera's ABC filing, it has no real estate or any tangible asset of significant value. *Ex. E,* p. 16. Its only significant assets are those limited funds that remain in the bank accounts of Aliera and its subsidiaries, its "loans" to "shareholders" and its claims against their parties. *See id.* The location of these assets does not justify a change of venue.

---

[10]     Of the thirty largest creditors of Aliera, only five are headquartered in Georgia. *See Ex. G,* pp. 13-16. Most are professional advisors accustomed to appearing in distant fora, and for whom it may be more convenient and economical to appear in Delaware.

51.     The final, and the most important, criteria under convenience are the economic "administration of the estate" and the need for "ancillary administration if liquidation should result." These criteria weigh strongly in favor of retaining jurisdiction in Delaware. The Aliera bankruptcy is likely to follow the same path as the Sharity Bankruptcy. Neither corporation will resume business – the only path for Aliera is liquidation into a trust run to benefit its creditors. The Sharity Liquidating Trust represents the largest group of creditors, along with Petitioners, by orders of magniture. The U.S. Trustee is already well-educated about the Aliera business, and the former Subchapter V Trustee for the Sharity Bankruptcy could be appointed to oversee the Aliera bankruptcies. Indeed, it is essential that a completely independent fiduciary be appointed to oversee the Aliera bankruptcies, so that the company can no longer be manipulated to enrich and protect its insiders. The most efficient administration of the estate will occur in Delaware.

## VII.  NOTICE

52.     Notice of this motion will be provided to the parties set forth in the certificate of service that was filed together with this Motion. No other or further notice is required under the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules.

## VIII.  NO PRIOR REQUEST

53.     No prior request for the relief requested in this motion has been made to this Court or any other.

## IX.  CONCLUSION

**WHEREFORE**, the Court should enter (a) an interim order, substantially in the form of the Proposed Interim Order, on either ordinary or shortened notice, directing or requiring the parties to the later-filed voluntary bankruptcy cases of the Debtor and its four affiliates not to proceed further with those cases while this motion remains pending, except to the extent that proceeding

further is necessary to preserve the property of Aliera's bankruptcy estates, and/or (b) an order, substantially in the form of the Proposed Transfer Order, transferring venue of the later-filed voluntary bankruptcy cases of the Debtor and its four affiliates from the U.S. Bankruptcy Court for the Northern District of Georgia to this Court, the U.S. Bankruptcy Court for the District of Delaware, so, to the maximum extent possible, the rights and obligations of Aliera, its creditors, its insiders, and any other parties in interest can be determined in a single court.

Dated: December 28, 2021                    Respectfully submitted,
      Wilmington, Delaware

                                   */s/ Joseph H. Huston, Jr.*
                                   Joseph H. Huston, Jr. (No. 4035)
                                   David W. Giattino (No. 5614)
                                   **STEVENS & LEE, P.C.**
                                   919 North Market Street, Suite 1300
                                   Wilmington, Delaware 19801
                                   Tel:       (302) 425-3310 | (302) 425-2608
                                   Fax:       (610) 371-7972 | (610) 371-7988
                                   E-mail:   joseph.huston@stevenslee.com
                                                          david.giattino@stevenslee.com

                                   – and –

                                   Cyrus Mehri (admission *pro hac vice* pending)
                                   **MEHRI & SKALET, PLLC**
                                   1250 Connecticut Avenue, NW, Suite 300
                                   Washington, D.C. 20036
                                   Tel:       (202) 822-5100
                                   Fax:       (202) 822-4997
                                   E-mail:   CMehri@findjustice.com

                                   – and –

                                   Eleanor Hamburger (admission *pro hac vice* pending)
                                   **SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC**
                                   3101 Western Avenue, Suite 350
                                   Seattle, Washington 98121
                                   Tel:       (206) 223-0303
                                   Fax:       (206) 223-0246
                                   E-mail:   ele@sylaw.com

                                   *Counsel to the Petitioning Creditors*